## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-cv-20385-BLOOM/Otazo-Reyes

DION MAPP,

      Plaintiff,

v.

MERRICK INDUSTRIAL MANAGEMENT
CORPORATION, *et al.*,

      Defendants.

_____/

### <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** is before the Court upon Defendants Merrick Industrial Management Corporation and Lonny Anger's Motion for Summary Judgment, ECF No. [20] ("Motion"), filed on December 5, 2022. The Court has carefully reviewed the Motion, all opposing and supporting submissions,[1] the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendants' Motion is granted.

### I.      BACKGROUND

This is an employment dispute between Plaintiff Dion Mapp ("Mapp") and his former employers, Defendants Merrick Industrial Management Corporation ("Merrick") and Lonny Anger ("Anger"). ECF No. [1]. Mapp asserts violations of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000d, *et seq.*, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760. *Id.* Specifically, Mapp brings claims of retaliation against each Defendant under § 2000e-3(a) of Title

---

[1]Defendants supported their Motion with a Statement of Material Facts ("SMF"), ECF No. [21]. Plaintiff Dion Mapp filed a Response to Defendants' Motion, ECF No. [27], along with a Counter Statement of Material Facts, ECF No. [28] ("CSMF"). Defendants filed a Reply, ECF No. [30], with a Reply Statement of Material Facts, ECF No. [31] ("RSMF").

Case No. 22-cv-20385-BLOOM/Otazo-Reyes

VII (Count I (Merrick); Count III (Anger)), and under § 760.10(7) of the FCRA (Count II (Merrick); Count IV (Anger)). He also brings claims of hostile work environment against each Defendant under § 2000e-2(a) of Title VII (Count V (Merrick); Count VII (Anger) and under § 760.10(1) of the FCRA (Count VI (Merrick); Count VIII (Anger)). *Id*. Lastly, Mapp brings claims of discrimination against Merrick under § 2000e-2(a) of Title VII (Count IX) and under § 760.10(1) of the FCRA (Count X). *Id*.

In their Motion, Defendants argue: (a) all claims against Anger must be dismissed because there is no basis for individual liability under Title VII or the FCRA; (b) Mapp's retaliation claims are procedurally barred and otherwise deficient; (c) Mapp's hostile work environment claims are deficient; and (d) Mapp's discrimination claims fail because he cannot show that individuals not within his class were treated more favorably than he was. *See generally* ECF No. [20].

In Response, Mapp agrees that there is no basis for liability against Defendant Anger, conceding that summary judgment is appropriate as to Anger on Counts III, IV, VII, and VIII. ECF No. [27] at 1. Mapp opposes the remainder of Defendants' summary judgment arguments. *See generally* ECF No. [27].

## II.     MATERIAL FACTS

Based on the parties' respective statements of material facts in support of and in opposition to the Motion, along with the evidence in the record, the following facts are not genuinely in dispute, unless otherwise noted.

### A.  Background

Mapp is a 48-year-old African American man who became an apprentice carpenter in 2016 and joined the United Brotherhood of Carpenters and Joiners of America ("Carpenters Union").

SMF ¶¶ 1-2; CSMF ¶¶ 1-2. Lonny Anger is the owner and President of Merrick, a construction company based in Miami. SMF ¶ 3; CSMF ¶ 3; ECF No. [1] ¶ 5.

Mapp worked for Merrick for 10 months, from late February 2020 to December 17, 2020. SMF ¶ 18; CSMF ¶ 18. He was assigned to work on an expansion of the Jackson Hospital's Diagnostic Treatment Center ("DTC Project"). SMF ¶ 5; CSMF ¶ 5. Mapp was hired to perform mainly "laborers work," meaning "sweeping, dumping trash, lifting, hauling, unloading trucks, etc." SMF ¶ 12; CSMF ¶ 12. Although Mapp primarily performed laborers work, he also performed some carpentry work. SMF ¶¶ 11-12; CSMF ¶¶ 11-12. Even when Mapp performed laborers work, he was paid at the higher wage of an apprentice carpenter. SMF ¶ 14; CSMF ¶ 14. He additionally received overtime pay and additional pay for working as a part-time elevator operator. SMF ¶¶ 16, 17; CSMF ¶¶ 16, 17.

Mapp was assigned to work with a crew led by foreman Freddy Valladares. SMF ¶ 10; CSMF ¶ 10. Valladares' superintendent was Chris Morrison. *Id.* Mapp felt that he was not being assigned sufficient carpentry work, which Mapp preferred over laborers' work. SMF ¶ 29; CSMF ¶ 29. As an apprentice carpenter, he was less qualified than journeyman carpenters to perform carpentry work. *Id.*

Mapp testified that Valladares frequently made "[B]lack jokes" at Mapp's expense. SMF ¶ 35; CSMF ¶¶ 35. At his deposition, Mapp testified that he was only able to recall one such joke, which began, "How many Blacks does it take to screw in a lightbulb?" *Id*. Mapp found the jokes offensive. *Id*. Valladares denies making any such jokes. *Id*.

Mapp also testified that Valladares made jokes about theft and prison. SMF ¶ 35; CSMF ¶ 35. Mapp provided two specific examples. On one occasion, Valladares looked at Valladares' vehicle and stated: "Nice truck. Is it stolen?" SMF ¶ 34; CSMF ¶ 34. As to prison, Mapp testified

that Valladares made jokes about Mapp's time in prison, asking him if he "ever drop[ped] the soap." Mapp. Dep. at 81:8-15, ECF No. [28-1]. It is uncontested that Valladares knew Mapp had served time in prison, though the parties dispute how Valladares gained that knowledge. SMF ¶ 34; CSMF ¶ 34. Valladares testified that Mapp frequently talked about his time in prison, but Mapp denies doing so. *Id*. Valladares categorically denies having made any jokes about theft or Mapp's time in prison. SMF ¶¶ 34-35; CSMF ¶¶ 34-35.

Mapp testified that he also suffered harassment from Valladares' supervisor, Superintendent Chris Morrison. SMF ¶ 47; CSMF ¶ 47. Mapp testified that Morrison asked another Black employee, Bradley Powell, to "sing Negro hymns." SMF ¶ 49; CSMF ¶ 49. On another occasion, Morrison told him that "he's from Georgia and . . . they don't like Blacks up in Georgia" and "the stuff that Blacks get away down here they wouldn't get away with in Georgia." Mapp Dep. at 98:2-8, ECF No. [28-1]. Mapp testified that Morrison "made black jokes all the time." *Id*. at 98:2-3.

At some point in mid-November 2020, Mapp injured his finger on the job. SMF ¶ 74; RSMF ¶ 74. Mapp testified that a safety employee at the DTC Project told Mapp not to lift anything heavy for several days. SMF ¶ 38; CSMF ¶ 38. Mapp testified that the following day, Valladares assigned him to the type of work that the safety employee had advised Mapp to avoid. SMF ¶ 38; CSMF ¶ 38.

On November 16, 2020, Mapp testified that an incident occurred between Mapp and Morrison. Mapp Dep. at 181:8-18, ECF No. [28-1]. Morrison had called a meeting to discuss "workers not doing what they were supposed to do." *Id.* at 99. During the meeting, Mapp received a call on his cellphone from a co-worker who wanted to inform Morrison that he was going to be late to the meeting. *Id*. at 100. Morrison said, "I don't want this shit," and "slammed" Mapp's

phone on the ground. *Id*. at 100:19-21. The phone landed in the grass and did not break. *Id*. at 101:7-9. Mapp understood that Morrison was angry at the late co-worker, but thought it was unnecessary for Morrison to throw his phone on the ground. *Id.* at 101. Mapp believes that Morrison would not have reacted that way to a White or Hispanic worker. *Id*. at 102.

### B.  Mapp's Formal Complaint

Following the phone incident, on November 16, 2020, Mapp sent an email labeled "Formal complaint" to Merrick's owner and president, Defendant Anger. ECF No. [28-7] at 5. Therein, Mapp complained that Valladares and Morrison were subjecting him to "unfair treatment because of [his] race." *Id*. He advised that Valladares was denying him opportunities to learn and perform carpentry, and that Valladares was assigning better tasks to Hispanic workers. *Id.* He also complained of the phone incident, Valladares' assignment of hard labor to Mapp despite his finger injury, and an instance in which he claims Valladares was illegally recording him at work. *Id*. The email contained no allegations of racial jokes, comments, or harassment.  *Id.*

On November 17, 2020, Anger met with Mapp and his union representative to discuss Mapp's formal complaint. SMF ¶ 51; CSMF ¶ 51. Anger asked whether Mapp's relationship with Valladares and Morrison was "beyond repair," to which Mapp responded "Not from my side, I'm fine[.]" Mapp Dep. at 111:16-25, ECF No. [28-1]. Anger offered Mapp the opportunity to move to another job site to receive more carpentry experience, but Mapp declined, saying he preferred to stay on the DTC Project. SMF ¶ 52; CSMF ¶ 52. Mapp did not complain of racial harassment or report that Valladares or Morrison were making racist jokes or comments. Mapp Dep. at 193:12-16, ECF No. [28-1].

After the November 17, 2020, meeting, Anger sent Mapp an email memorializing their discussion. ECF No. [28-7] at 3-4. According to that email, Mapp told Anger that he "just want[ed]

to be treated fairly and an opportunity to learn the carpentry trade." *Id.* Anger and Mapp "agreed that our ultimate resolve for this is to find [Mapp] more carpentry apprentice work opportunities where we could." *Id.* at 4. Anger explained that work at the DTC Project was coming to an end and requested "more patience to find [Mapp] more opportunity." *Id.* Anger advised he would discuss the issues Mapp had raised with Valladares and Morrison. *Id.*

Anger spoke with Valladares and Morrison immediately after meeting with Mapp. CSMF ¶ 87; RSMF ¶ 87. According to Mapp, Valladares was offended and later accused Mapp of throwing "him under the bus[.]" Mapp Dep. at 111:10-15, ECF No. [28-1]. Mapp testified that Valladares convinced Anger to move Mapp off the DTC Project. *Id.* at 137:13-16. Anger testified that Mapp was transferred because the DTC project was winding down and he believed Mapp would get more carpentry experience, as he requested, at another worksite. Anger Dec. ¶ 34, ECF No. [21-3].

### C. Mapp's Transfers

Mapp was transferred to a project next door to the DTC Project, consisting of construction on the Jackson Memorial Hospital's Christine E. Lynn Rehabilitation Center ("CEL Project"). SMF ¶ 53; CSMF ¶ 53. Mapp's hourly wage remained the same as it had been at the DTC Project. SMF ¶ 55; CSMF ¶ 55.

On November 19, 2020, shortly after the transfer, Anger sent an email to Mapp stating, "I am very glad that you "Are loving it" (Your words) in regards to moving over from your laborer job on the DTC project over to the CEL project learning carpentry skills from Foreman Gio." ECF No. [28-7] at 3. Mapp did not respond to Anger's email. Mapp denies having told Anger that he was "loving it" at the CEL Project. CSMF ¶ 54.

On November 21, Mapp wrote an email to Anger stating:

> I'm writing you to inform you that I attended school on Friday Nov. 21 along with 3 other Merrick employees and they informed me that they received a call to come in Friday night after school and no one called me. Please find out why I was the only one not called to make up my hours.

ECF No. [28-7] at 2-3. The email was sent from Mapp's email address, which contained the moniker, "Mo-Lester-Man-553." *Id.*

Anger responded less than two hours later with an email that Mapp describes as "unnecessarily hostile." ECF No. [27] at 6-7. In the email, Anger chastised Mapp for failing to follow the proper chain of command, for ordering Anger to "find out an answer," and for using an email address nicknamed "Mo-Lester-Man." ECF No. [28-7] at 1-2. In answer to Mapp's question, Anger explained that the individuals invited to perform late work were all assigned to the DTC Project, unlike Mapp, who was now "on a completely different project, so that is the reason why the message likely did not reach [him]." *Id.* at 2. Anger further explained that the late work was laborers' work, unlike carpentry opportunities which Mapp had requested. *Id.* He stated that further opportunities for late work "can be worked out" and directed Mapp to speak with his supervisor or Morrison. *Id.* Mapp did not respond.

At the end of November, the CEL Project was coming to a close, and Merrick transferred Mapp to a third work site – the "Amazon Project". SMF ¶ 59; CSMF ¶ 59. There, Mapp worked light duty because of the injury to his finger. *Id.* While on the CEL and Amazon Projects, Mapp continued to work overtime hours at the DTC Project. SMF ¶ 60; CSMF ¶ 60. At the Amazon Project, Mapp performed carpentry work. SMF ¶ 62; CSMF ¶ 62.

On December 3, Mapp reinjured his finger, left work, and went to see a doctor. SMF ¶ 63; CSMF ¶ 63. He worked one additional full week, but then left the job on December 17, 2020, because his finger was causing him pain. SMF ¶¶ 64-65; CSMF ¶¶ 64-65. He never returned to work at Merrick. SMF ¶ 65; CSMF ¶ 65.

On or near January 1, 2021, Mapp exchanged text messages with Morrison, who asked Mapp when he planned to return to work. SMF ¶ 66; CSMF ¶ 66. Mapp responded, "Happy New Year to you and your Family. The Doctor doesn't want me to use my right hand at all, and I'm right handed. If there is anything I can do on the job with one hand I can return." SMF ¶ 66; CSMF ¶ 66.

Morrison wrote back: "Unfortunately, I don't have anything that is one-handed at this time. Please keep me in the loop as it pertains to your hand and when you can return. Again Happy New Year!" SMF ¶ 66; CSMF ¶ 66.

Mapp hired a worker's compensation attorney, who filed a document with the Office of the Judge of Compensation Claims, stating that as of January 15, 2021, Mapp's disability was total in nature. SMF ¶ 67; CSMF ¶ 67.

On March 22, 2021, Mapp, through counsel, filed a charge of race and color discrimination with the Equal Employment Opportunity Commission ("EEOC"). SMF ¶ 71; CSMF ¶ 71. Mapp's EEOC charge complained of discrimination based on race, color, and "other." ECF No. [28-10]. The EEOC charge claims that Valladares "constantly made discriminatory jokes around [Mapp]," including prison jokes and jokes about Mapp's truck being stolen. *Id.* It also alleges that Morrison threatened to fire Mapp on one occasion. *Id*. It contains no examples of comments or jokes that were racist in nature. *Id*. The box labeled "retaliation" on the EEOC form was not checked. *Id.*

On November 8, 2021, the EEOC dismissed Mapp's charge. SMF ¶ 72; CSMF ¶ 72. Mapp filed suit on February 7, 2022. ECF No. [1].

## III.   LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations[.]'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also Crocker v. Beatty,* 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990) (citation omitted).

## IV.    DISCUSSION

Defendants seek summary judgment as to all ten claims within Mapp's Complaint. They argue that (A) Anger cannot be individually liable under Title VII or the FCRA; (B) Mapp's retaliation claims are procedurally barred and are otherwise deficient; (C) Mapp's hostile work environment claims are deficient; and (D) Mapp's discrimination claim fails because he cannot

show that individuals not within his class were treated more favorably. *See generally* ECF No. [20]. The Court addresses each in turn.

### A. Individual Liability Against Defendant Anger

Defendants first argue that all claims against Anger must be dismissed because there is no basis for individual liability under Title VII or the FCRA. ECF No. [20] at 3 (citing *Moody v. Miami-Dade Cty.*, No. 19-cv-24638, 2020 U.S. Dist. LEXIS 223500, at *17-18 (S.D. Fla. Nov. 25, 2020)). In Response, Mapp agrees that there is no basis for liability against Defendant Anger and summary judgment should be granted as to all counts against Anger. ECF No. [27] at 1. The Court agrees.

Accordingly, Defendants' Motion is granted as to **Counts III**, **IV**, **VII**, and **VIII**.

### B. Retaliation Claims

Next, Defendants seek summary judgment on Mapp's claims of retaliation. Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII, "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "To make a prima facie case for a claim of retaliation under Title VII, a plaintiff must first show (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (quotation marks omitted).

### i.  Exhaustion of Remedies

Defendants first argue that Mapp's retaliation claims are procedurally barred because Mapp did not explicitly claim retaliation in his EEOC charge. ECF No. [20] at 4. Mapp responds that,

Case No. 22-cv-20385-BLOOM/Otazo-Reyes

although his EEOC charge did not have a check marked in the box labeled "retaliation," the allegations within Mapp's charge set forth a basis for a charge of retaliation. ECF No. [27] at 2-3.

"Prior to filing a Title VII action, . . . a plaintiff must file a charge of discrimination with the EEOC." *Gregory v. Ga. Dep't of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004) (citation omitted). "The purpose of this exhaustion requirement is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Id.* (quotation marks omitted) (alteration in the original). "[A] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can be reasonably be expected to grow out of the charge of discrimination." *Id.* at 1280 (quotation marks omitted). However, "[t]he scope of an EEOC complaint should not be strictly interpreted" such that "procedural technicalities" could result in a bar of claims brought under Title VII. *Id.* (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970)).

Plaintiff's EEOC charge contains seven paragraphs of allegations. *See* ECF No. [28-10]. The first six-and-a-half paragraphs describe Mapp's alleged mistreatment at Merrick, including instances of discrimination by Mapp's supervisors, Valladares and Chris Morrison. *Id.* The final paragraph concludes as follows:

> I met with [one] of the Union Reps and a Supervisor. I mentioned all that had been happening with Mr. Valladares and Chris. They asked me if I wanted to move to another site and I respectfully declined because I liked the work at my current location. The meeting ended with them saying they would speak to Mr. Valladares and Chris to work things out. Thirty minutes after the meeting Mr. Valladares calls me and tells me that I threw him under the bus. I responded by telling him I was only expressing to them the truth about the way he and Chris treated me. Three days later Chris calls me and tells me that I am being moved to another site. He claimed that I was transferred because there was no Carpentry work. Ultimately, I was transferred to a location where my pay was lowered and where I was doing labor work instead of carpentry. I believe that I was treated differently as a result of being an African American with a criminal record . . . .

11

*Id.* at 2. Mapp argues that these allegations – that Mapp was transferred to an inferior work site shortly after he complained of mistreatment – are sufficient to form the basis of a claim for retaliation. ECF No. [27] at 2.

Mapp relies on *Gregory*, 355 F.3d at 1280, wherein a plaintiff filed an EEOC charge after she was terminated. In her EEOC charge, the plaintiff "only marked the spaces for gender and race discrimination in the 'charge of discrimination' portion of the template form, leaving the 'retaliation' space blank." *Id.* at 1279. In her lawsuit, however, she additionally alleged that she was terminated due to retaliation because she claimed about race discrimination against here. *Id.* The Eleventh Circuit held that the plaintiff's retaliation claim was not barred because the "facts alleged in her EEOC charge could have reasonably been extended to encompass a claim for retaliation because they were inextricably intertwined with her complaints of race and sex discrimination." *Id.* at 1280.

Defendants attempt to distinguish this case from *Gregory* in that Mapp was represented by counsel when he filed his EEOC charge, unlike the plaintiff in *Gregory*. It is true that the *Gregory* court repeatedly noted the plaintiff's unrepresented status and therefore interpreted her EEOC charge liberally. 355 F.3d at 1280. However, regardless of whether a plaintiff was represented by counsel, "mere procedural technicalities" such as the failure to check a box are not meant to bar Title VII claims. *Sanchez*, 431 F.2d 455. Here, Mapp's EEOC charge states that, in response to his complaint to Anger, he was moved to another job site, against his will, wherein he was paid less. ECF No. [28-10] at 2. Those allegations provide far more factual support for a retaliation claim than did the EEOC charge in *Gregory*, which did not mention that the plaintiff had complained to a supervisor about discriminatory conduct prior to her termination. *See* 355 F.3d at 1278.

The cases cited by Defendants are inapposite. In *McWhorter v. Nucor Steel Birmingham*

*Inc.*, 304 F. Supp. 3d 1185, 1191 (N.D. Ala 2018), the plaintiff filed an EEOC charge, with the assistance of counsel, wherein the plaintiff alleged retaliation but did not include any allegations regarding the plaintiff's age or disability. *Id.* The *McWhorter* court concluded that the plaintiff's claims based on age and disability discrimination were barred because the plaintiff's "EEOC charge as drafted gave no notice whatsoever to Defendant that Plaintiff was claiming age or disability discrimination[.]" *Id.* at 1192. Similarly, in *Davis v. Infinity Ins. Co.*, No. 15-cv-01111, 2017 WL 4224588, at *8 (N.D. Ala. Sept. 22, 2017), the plaintiff wholly failed to "state the general factual basis for her retaliation" claims.

Here, by contrast, Mapp's EEOC charge alleges that, shortly after he complained of discrimination at his work, he was transferred to another work site where he was paid less. *See* ECF No. [28-10] at 2. Unlike the EEOC charges in *McWhorter* and *Davis*, Mapp's charge contained the factual basis for the claim he seeks to assert here. As both *Davis* and *McWhorter* recognized, "the mere failure to check a box is not dispositive[.]" *McWhorter*, 304 F. Supp. 3d at 1191; *Davis*, 2017 WL 4224588 at *8 (noting that the plaintiff's charge was not deficient due to "a mere procedural technicality" but rather because it lacked the necessary substantive allegations to form a basis for plaintiff's additional claim). Mapp's charge "stated facts from which a reasonable EEOC investigator could have concluded that what [he] had complained about is retaliation[.]" *Gregory*, 355 F.3d at 1280. Barring Mapp's claim of retaliation because he did not check the "retaliation" box or explicitly write "retaliation" would contravene the Eleventh Circuit's instruction that "procedural technicalities are not to stand in the way of Title VII complainants." *Sanchez*, 431 F.2d at 465.[2]

---

[2] The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Accordingly, Plaintiff's retaliation claims are not procedurally barred. The Court therefore proceeds with analyzing Defendants' argument that Mapp has failed to set forth a prima facie case of retaliation.

## ii.    Prima Facie Case of Retaliation

Defendants argue that Mapp has failed to set forth a prima facie case of retaliation because he did not suffer an adverse employment action. ECF No. [20] at 9. "[I]n the context of a Title VII retaliation claim, a materially adverse action 'means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The adverse action must be "significant" as opposed to "trivial." *Burlington*, 548 U.S. at 68. "[N]ormally petty slights, minor annoyances, and simple lack of good manners" do not amount to a materially adverse action. *Id*. (citation omitted).

Mapp asserts two adverse employment actions: (1) his involuntary transfer from the DTC Project; and (2) his claim of "constructive discharge." ECF No. [27] at 4-5.

### (1) Transfer

First, Mapp argues that his transfer from the DTC Project to the CEL Project and then to the Amazon Project constitutes adverse action because his pay was reduced after the first transfer. *Id*. However, the uncontroverted evidence in this case does not support Mapp's contention. At all three sites, Mapp received the same hourly pay. Moreover, even after his transfer, the record reflects Mapp continued to work overtime hours at the DTC Project. SMF ¶¶ 55, 60, CSMF ¶ 55, 60. While it is true that Mapp's total take-home pay was lower during the two weeks immediately following his first transfer, that reduction was almost entirely the result of not working two workdays of each of those weeks because he took two days off to attend carpentry training at the

union hall, and then the site was closed for two days during Thanksgiving week. SMF ¶ 56; CSMF ¶ 56.

Mapp points to one occasion after his transfer in which he complained to Anger that, unlike workers on the DTC Project, he had not received a notification of an opportunity to work night hours at the DTC Project. ECF No. [27] at 7. He contends that Anger responded with a "hostile email" which explained that Mapp was working on a different project, "so that is the reason why the message likely did not reach [him]." ECF No. [27] at 7. Anger's response reflects that it was a reaction to Mapp's initial email and the fact that it contained a moniker, "Mo-Lester-Man-553," which Anger deemed offensive and unprofessional. ECF No. [21-1] at 77. Regardless, Title VII "does not set forth a general civility code for the American workplace." *Burlington*, 548 U.S. at 68 (quotation marks omitted). As for the substance of Mapp's complaint regarding the lack of notification, Mapp is not contesting the veracity of Anger's explanation as to why he was not notified, nor is Mapp arguing that this single instance constitutes retaliation. ECF No. [27] at 6. Rather, the Court considers this instance of missed overtime hours within the "constellation of surrounding circumstances" relating to Mapp's transfer. *Id.* (quoting *Oncale v. Sundwoner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)).

Mapp argues that, even accounting for the four days he did not work during the last two weeks of November, he still received on average less pay following his transfer. ECF No. [27] at 8. Mapp's mathematics are difficult to follow, but they appear to rest on the erroneous assumption that he did not receive overtime pay in a typical week. *Id.*; *see* ECF No. [21-1] at 13 (Mapp admitting that he regularly worked overtime). The average pay Mapp received during his only two full work weeks after the transfer from the DTC Project – $926.82 – is slightly less than the average he received prior – $983.70. SMF ¶ 56; CSMF ¶ 56.

However, as noted above, it is uncontested that Mapp received the same hourly wage before and after his transfer from the DTC Project, and after his transfer, he continued to work overtime on the DTC Project. SMF ¶¶ 55, 60; CSMF ¶¶ 55, 60. Moreover, Mapp asserts that overtime work at the DTC Project was typically "hard labor," ECF No. [21-1] at 13, which he was supposedly unable to perform after his finger injury, which restricted him to "light-duty work restrictions." ECF No. [27] at 5; SMF ¶ 59; CSMF ¶ 59. Considering the overall circumstances, the slight difference in Mapp's take-home pay does not reflect a "non-trivial reduction in work hours" such that it could qualify "as an adverse employment action." *Menzie v. Ann Taylor Retail, Inc.*, 549 Fed. App'x 891, 894 (11th Cir. 2013).

Mapp does not argue that either the CEL Project or the Amazon Project entailed less prestige, opportunities for advancement, or were otherwise inferior to the Amazon Project. *See Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998) (providing examples of circumstances that could constitute an adverse employment action). Mapp agrees that he was able to do more carpentry work at the CEL Project but complains that he was only there for one week. Mapp Dep. at 138:1-9, 194:12-14, ECF No. [28-1]. He concedes that at the Amazon Project he was able to work light duty due to his injured finger and that Merrick was hired to do carpentry work on that project. SMF ¶¶ 59, 62, CSMF ¶¶ 59, 62.

Upon a thorough consideration of the record and "the particular circumstances" of Mapp's transfer, the Court concludes that Mapp has not met the objective standard of showing that "a reasonable employee would have found the challenged action materially adverse[.]" *Burlington*, 548 U.S. at 68-69 (quotation marks omitted). Mapp received the same hourly wage after the transfers, he had substantially the same opportunities to work overtime, and he was afforded more opportunities to do the type of carpentry work that he requested from Anger. Under those

circumstances, Mapp's transfers to the CEL Project and the Amazon Project did not have "a materially adverse effect" on him. *Crawford*, 529 F.3d at 973 (citing *Burlington*, 548 U.S. at 68)).

### (2) Constructive Discharge

Second, Mapp argues that he was "constructively discharged." ECF No. [27] at 5. Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (citations and quotations omitted). Because "constructive discharge is tantamount to an actual discharge," it "constitutes an adverse employment action." *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1267 (11th Cir. 2021).

Defendants argue that Mapp's constructive discharge claim is procedurally barred and substantively baseless. ECF No. [30] at 5. The Court agrees with Defendants on both grounds. As a procedural matter, Mapp does not allege in his Complaint that he was constructively discharged. *See generally* ECF No. [1]. In his allegations of retaliation, Mapp solely argues that Merrick "retaliated against Mr. Mapp when it transferred him to another construction site[.]" *Id.* ¶¶ 62, 74. The Complaint fails to set forth the circumstances that led to Mapp's termination of employment at Merrick. *See generally id*. As such, it would be procedurally improper to allow Mapp to "raise a new claim at the summary judgment stage." *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003).

Though the Court need not consider the merits of Mapp's constructive discharge claim, it equally fails. To establish constructive discharge, the plaintiff must show "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Bryant*, 575 F.3d at 1298. Mapp does not contest that he left his work on December 17, 2020, because his finger was causing him pain. SMF ¶ 65; CSMF

¶ 65. At that time, he was assigned to the Amazon Project, wherein Mapp admitted that he did not experience an uncomfortable or hostile work environment. ECF No. [21-1] at 42-43. When Mapp's supervisor asked him if he planned to return to work, Mapp answered that his doctor forbid him from using his "right hand at all," but offered to perform one-handed work if any such work were available. SMF ¶ 66; CSMF ¶ 66. Mapp subsequently filed for worker's compensation, claiming a total disability as a result of his finger injury. SMF ¶ 67; CSMF ¶ 67. Under those uncontested facts, no reasonable juror could find that Mapp was constructively discharged.

On the merits and, as a matter of law, Mapp has failed to demonstrate that he suffered an "adverse employment action" as a result of his formal complaint to Anger. He therefore fails to set forth a prima facie case of retaliation under Title VII. *Gogel*, 967 F.3d at 1135.

Accordingly, Defendants' Motion is granted as to **Counts I** and **II**.

### C. Hostile Work Environment

Mapp alleges in Counts V through VIII that Defendants subjected him to a racially hostile work environment. Specifically, Mapp alleges that Defendants subjected him to "unwelcome harassment when Valladares and Morrison made egregious, malicious, and stereotypical remarks about Mr. Mapp's race." ECF No. [1] ¶ 113. Defendants argue that Mapp's hostile work environment claims fail because: (i) Mapp cannot show that he was subjected to a racially hostile work environment; and (ii) Mapp unreasonably failed to take advantage of the corrective opportunities offered by Merrick.[3] ECF No. [20] at 10.

"A hostile work environment claim under Title VII requires proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

---

[3] Given the Court's conclusion that Mapp failed to show he was subjected to a racially hostile work environment, the Court does not address Defendants' second argument.

environment.'" *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1152 (11th Cir. 2020) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "To establish a hostile work environment claim, a plaintiff must show that: (1) he belongs to a protected group; (2) he suffered unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as national origin; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct liability or vicarious liability." *Id.* (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

Defendants argue that Mapp has failed to establish the fourth element of a hostile work environment claim – that the harassment was sufficiently severe or pervasive. ECF No. [20] at 10. "To show that harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment, an employee must prove that his work environment was both subjectively and objectively hostile." *Fernandez*, 961 F.3d at 1153 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc)). Defendants do not dispute that Mapp subjectively perceived the environment to be abusive.

The issue raised is whether "a reasonable jury could find the harassment objectively hostile." *Id*. Courts answer that inquiry by analyzing four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id*. (quoting *Mendoza*, 195 F.3d at 1246). "[N]o single factor is necessary to satisfy the objective inquiry of a hostile work environment claim." *Fernandez*, 961 F.3d at 1155. The evidence must be viewed "cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010)

(en banc).

### i.    Frequency of the Harassment

The Court begins with Mapp's evidence regarding the frequency of the harassment he suffered at Merrick. All of Mapp's allegations relate to comments and conduct by Foreman Valladares and Superintendent Morrison.

### (1) Valladares

Mapp testified that Valladares "always used to make jokes about prison and black jokes[.]" Mapp Dep. at 78:21-22, ECF No. [28-1]. Mapp was only able to recall one specific example of a joke that was overtly racist, which began: "How many Blacks does it take to screw in a lightbulb?" SMF ¶ 35; CSMF ¶ 35.

As to Valladares' prison jokes and jokes about Mapp's vehicle being stolen, the Court agrees with Defendants that such comments, while offensive and "boorish," do not constitute instances of racial harassment under Title VII. *Laosebikan v. Coca-Cola Co.*, 167 F. App'x 758, 765 (11th Cir. 2006). "In a race-based case, harassing statements and conduct must be of a racial nature before they can be considered in determining whether the severe or pervasive requirement is met." *Id.* (citation omitted). As Mapp concedes, Valladares was aware that Mapp had served time in prison. SMF ¶ 34; CSMF ¶ 34. Whether Valladares learned of that fact from Mapp's own comments (as he asserts), or from some other source (as Mapp asserts) has little relevance. The Declaration of Bradley Powell, Mapp's Black co-worker at Merrick, contains no references to prison or criminal jokes, indicating that Valladares was not making these comments toward all Black employees. *See* ECF No. [28-5]. Mapp has produced no evidence to support the inference that Valladares' prison and car-theft jokes were directed toward him because of his race. *See, e.g.*, *Griffin v. TNT Intern. Express*, 2008 WL 697680, at *7 (S.D.N.Y. 2008) ("It would not be

reasonable to infer that a reference to 'prison' was a reference to plaintiff's race, particularly in view of [defendant]'s knowledge of plaintiff's prior interactions with the criminal justice system. The comment may have been unfair and rude, but, on this record, it does not have a racial element to it."). Accordingly, the prison and car-theft jokes will not be considered in determining "whether the severe or pervasive requirement is met." *Laosebikan*, 167 F. App'x at 765.

Relatedly, Mapp testified that Valladares frequently insulted him and Powell by "basically" calling them "dumb" and lacking in "common sense." Mapp. Dep. at 184-85, ECF No. [28-1]. He claims that Valladares made these statements both in person and via phone text messages. *Id.* The offensive text messages have not been presented as evidence; Mapp asserts that he no longer has them. *Id*. at 184. The only text messages in the record between Mapp and Valladares are apparently cordial messages in which Mapp notifies Valladares that he is missing work due to his daughter's illness, and Valladares' subsequent inquiries regarding Mapp and his daughter's wellness and whether Map would return to work the following day. ECF No. [21-2] at 142-45. Mapp claims that he never heard Valladares make these comments to "nonblack people." Mapp. Dep. at 185:19-22. Powell's Declaration lacks allegations that Valladares called him or Mapp "dumb" or lacking in common sense. ECF No. [28-5].

Mapp cites *Rodgers v. W.S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993), and argues that "blanket criticism of the intelligence of a racially-defined class of employees" is actionable under Title VII. ECF No. [27] at 13. However, unlike the comments in this case, the statement at issue in *Rodgers* was unquestionably and vilely racist. *Rodgers*, 12 F.3d at 675 ("[you] black guys are too fucking dumb to be insurance agents"). While the comments here have a potentially racist element because Mapp testified that he "never heard Valladares make[ ] those remarks to non-Black people at the DTC site," CSMF ¶ 97, that Mapp did not hear such comments does not mean

they did not occur. As Defendants correctly point out, Mapp does not speak Spanish, so he could not have known what Valladares was saying to other workers in Spanish. ECF No. [30] at 8. While the comments that one is "dumb" and lacking in "common sense," are offensive, they are devoid of racial content. As such, Mapp has failed to show that Valladares' comments on Mapp's intelligence were "of a racial nature." *Laosebikan*, 167 F. App'x at 765.

### (2) Morrison

Mapp testified that Morrison "made black jokes all the time." Mapp. Dep. at 98:2-4, ECF No. [28-1]. He provides two specific examples. In one, Morrison told Mapp that "Blacks down here get away with stuff that they wouldn't get away with in Georgia." SMF ¶ 78; CSMF ¶ 78. The testimony reveals no further context of this comment.

On another occasion, Morrison asked Bradley Powell to "sing Negro hymns." SMF ¶ 49; CSMF ¶ 49. In his Declaration, Powell confirms that Morrison once told him at a meeting to "sing an old Negro spiritual tune." ECF No. [28-5] ¶ 13. Mapp testified that the comment occurred after a morning meeting, in which Morrison would typically "start making jokes." Mapp. Dep. at 103:4-6, ECF No. [28-1]. Mapp explained that Morrison asked Powell to "sing some Negro hymns" "like a joke," "like it was supposed to be funny." *Id*. at 103:20-21. Mapp reacted by exchanging a look with Powell and then walking away. *Id*. at 103:11-14.

In his Declaration, Powell additionally asserts that Morrison told him on several occasions that he would "fire [his] Black ass," and Valladares "would frequently say, 'Brad, find another job and let me bring my people in.'" *Id*. ¶¶ 15-16. However, Mapp did not testify to overhearing such statements. *See generally* ECF No. [28-1]. While a Plaintiff can support a hostile work environment claim with comments that were not explicitly directed to him, the plaintiff must have heard the comments – or at least been aware of them – for them to factor into the hostility of his

work environment. *See Reeves*, 594 F.3d at 807.

Mapp additionally complains of one instance in which Morrison threw Mapp's phone on the grass. Mapp Dep. at 99-100, ECF No. [28-1]. On that occasion, Morrison said nothing that could be construed as racist, and, apart from Mapp's belief, there is no evidence to indicate that Morrison's act had anything to do with Mapp's race. Indeed, Mapp recognizes that Morrison was acting out of anger toward another (non-Black) individual. *Id*. at 100:19-21. Thus, the Court agrees with Defendants that the phone incident does not constitute conduct "of a racial nature." *Laosebikan*, 167 F. App'x at 765

To sum up the evidence of racial harassment: Valladares made racist jokes "on a daily basis," and Morrison made similar jokes whenever he was at the DTC Project site, which was two to three days a week. Mapp Dep. at 179, ECF No. [28-1]. Mapp has produced three specific examples of overtly racist comments that he personally heard – Valladares' lightbulb "joke," Morrison's Georgia comment, and Morrison's "Negro" hymns comment directed to Bradley Powell.

Defendants argue that the above evidence does not amount to a showing of "frequent" harassment. ECF No. [30] at 6-7. They assert that the Court can only consider specific allegations of harassment and must discount Mapp's "conclusory" allegations that he was subjected on a daily basis to offensive jokes. *Id*. Defendants draw support from *Alexander v. Opelika City Schools*, 352 F. App'x 390 (11th Cir. 2009) and *Godoy v. Habersham Cnty.*, 211 F. App'x 850 (11th Cir. 2006), cases in which the Eleventh Circuit agreed with the district court that a plaintiff had failed to establish "frequent" harassment at the summary judgment stage. In *Alexander*, the plaintiff "testified that he was called 'boy' constantly, but could only recall eight specific instances over the course of two years[.]" 352 F. App'x at 393.  The *Godoy* plaintiff testified that he was subject

to racial insults "almost every shift," provided one specific example of such an insult, and claims to have "received a threatening phone call." 211 F. App'x at 854. Both cases support that an employee "must present concrete evidence in the form of specific facts, not just conclusory allegations." *Godoy*, 211 F. App'x 854 (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990)).

However, the Court is persuaded by *Fernandez*, which, unlike *Godoy* and *Alexander*, is a published Eleventh Circuit decision. *See* 961 F3d at 1153. The *Fernandez* court discussed *Godoy* and *Alexander* and explicitly rejected "the proposition that a plaintiff must recall every specific instance of discriminatory conduct to establish that the conduct was frequent." 961 F3d at 1154. The plaintiff in *Fernandez* testified that he was subjected to derogatory remarks "on a near-daily basis," and his "co-workers identified more than 10 specific examples of discriminatory remarks during the relevant period." *Id*. at 1153. Such evidence was sufficient to show that the harassment was frequent. *Id.* at 1154.

Here, Mapp's case is substantially weaker than that of the *Fernandez* plaintiff. As noted above, much of the conduct Mapp complains of is not of a racial nature for purposes of this Title VII analysis. Mapp and his co-worker Powell produced four specific instances of explicitly racist comments. Those specific instances, in combination with Mapp's allegations that he was subjected to racist jokes on a daily basis, arguably lead to the conclusion that Mapp experienced "frequent" harassment. *Fernandez*, 961 F.3d at 1153. Mindful of its duty to construe "all reasonable inferences in favor of the nonmovant, and . . . not weigh evidence or make credibility determinations,'" *Lewis*, 934 F.3d at 1179, the Court concludes that this frequency factor is in Mapp's favor.

Case No. 22-cv-20385-BLOOM/Otazo-Reyes

ii.     **Severity of the Conduct**

Turning to the second factor, Mapp has failed to show that the harassment in this case was "severe" within the standards set forth by the Eleventh Circuit. Title VII is implicated only where a workplace is "permeated with discriminatory intimidation, ridicule and insult," as opposed to the "mere utterance of an epithet." *Fernandez¸* 961 F.3d at 1154 (quoting *Harris*, 510 U.S. at 21).

First, most of the conduct in this case is materially different than the type of conduct the Eleventh Circuit has recognized as "severe." *See, e.g.*, *Fernandez*, 961 F.3d at 1152, 1154-55 (supervisor's insults regarding "sh*tty Cubans" and "f*cking Cubans" "repeatedly targeted a protected group with vulgar and derogatory language"); *Reeves*, 594 F.3d at 812 (describing a workplace permeated with sex-based derogatory epithets and pornography); *Miller*, 277 F.3d at 1276 ("Miller did not suffer from overhearing occasional off-color comments. Rather, [the plaintiff's coworkers] used the derogatory names in an intimidating manner, shouting them at Miller during the course of berating him for his job performance[.]"). In contrast to the open hostility of the conduct in those cases, virtually all conduct in this case consists of what Mapp repeatedly describes as "jokes." *See Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir. 1996) (finding "an alleged joke" to be "exactly the type of mere offensive utterance which should not, by itself, support a claim for hostile work environment").

This is not a case in which offensive comments continued despite the employee's requests that it stop. *See, e.g.*, *Fernandez*, 961 F.3d at 1154 (wherein insults persisted despite "specific requests that [it] stop"); *Reeves*, 594 F.3d at 812 (wherein offensive conduct continued over the plaintiff's "repeated complaints"). The record fails to support that Mapp ever complained of Valladares' or Morrison's conduct. Mapp never discussed the racist jokes with Valladares or Morrison directly, and he did not mention racist jokes or comments when he discussed his

discrimination concerns with Anger. SMF ¶ 46; CSMF ¶ 46; *see also* Saldivar Dep. at 62:6-9, ECF No. [28-2] (Mapp's union representative confirming that Mapp did not mention racist jokes at the meeting with Anger). In his deposition, Mapp had no meaningful response when asked why he did not report to Anger that he was "subjected to racist remarks on a daily basis." Mapp Dep. at 193:12-16, ECF No. [28-1] (Mapp answering, "I don't know. I don't remember why I didn't."). Had the comments been severe enough to alter "the terms and conditions of employment," *Faragher*, 524 U.S. at 788, Mapp would have mentioned those comments to Anger while the two were discussing other "terms and conditions of employment" that Mapp found unsatisfactory. Apparently, the first time Mapp revealed to anyone at Merrick that he was offended by Valladares and Morrison's conduct was when he filed his EEOC charge.

Finally, when Mapp discussed his Title VII concerns with Anger, Anger asked whether Mapp's relationship with Valladares and Morrison was "beyond repair," to which Mapp responded "Not from my side, I'm fine[.]" Mapp Dep. at 111:16-25, ECF No. [28-1]. Moreover, when asked by Anger if Mapp would like to be assigned on a different project away from Valladares and Morrison, Mapp declined, saying he preferred to stay on the DTC Project. SMF ¶ 52; CSMF ¶ 52. Thus, the record establishes that Valladares and Morrison's conduct was not severe enough to affect Mapp's relationship with them or to cause Mapp to avoid them. As such, the severity factor is in Defendants' favor.

### iii.   Physical Threats or Humiliation

The third hostile work environment factor requires the Court to judge whether the conduct "is physically threatening or humiliating, or a mere offensive utterance." *Fernandez*, 961 F.3d at 1153 (quoting *Mendoza*, 195 F.3d at 1246).

Regarding physical threats, Mapp argues in briefing that he was threatened by Morrison's

comment regarding how Blacks are treated in Georgia. ECF No. [27] at 13. However, Mapp's own testimony refutes that argument. Mapp testified that no one at Merrick – including Morrison – ever threatened Mapp with physical harm. Mapp Dep. at 133:1-12. ECF No. [28-1]. Moreover, when Mapp testified regarding Morrison's Georgia comment, he did not mention that he felt threatened. *Id.* at 98:2-8. In the circumstances of this case, including Mapp's testimony that he was never threatened with physical harm, and Mapp's subsequent assertion to Anger that he had no problem with Morrison, no reasonable juror could conclude that Morrison's Georgia comment constituted a physical threat.

As for humiliation, Mapp argues that "Morrison's instruction to Powell to sing a 'Negro spiritual tune' humiliated Powell in front of all his coworkers during a morning briefing." ECF No. [27] at 14. Mapp cites *Fernandez* for the proposition that the level of humiliation from offensive comments increases when the comments are made in the presence of others. 961 F.3d at 1155. Mapp is correct that conduct "not directed specifically at the plaintiff" may contribute to a claim of hostile work environment, but the relevant question remains whether Morrison's comment to Powell made *Mapp* – or a reasonable person in his position – feel humiliated. *Reeves*, 594 F.3d at 811. Mapp did not testify to having felt humiliated in that instance. *See* Mapp Dep. at 103, ECF No. [28-1]. Mapp testified that Morrison's apparent intention while making the comment was "to be funny." *Id*. at 103:20-21. Mapp's testimony reveals that he treated Morrison's comment as "a mere offensive utterance." *Fernandez*, 961 F.3d at 1153 (quoting *Mendoza*, 195 F.3d at 1246).

The only instance in which Mapp claims to have felt humiliated was during the meeting in which Morrison threw Mapp's phone on the grass. ECF No. [28-7] at 6. Mapp emailed Anger that he "was so humiliated in front of everyone and this is not how a Superintendent or Supervisor is supposed to treat there [sic] employees." *Id*. However, there is no record evidence establishing that

Morrison's conduct during that meeting was related to Mapp's race. Morrison's conduct may have been offensive and "boorish," but because it was not "of a racial nature," it does not constitute an instance of racial harassment under Title VII. *Laosebikan*, 167 F. App'x at 765. As such, the Court concludes that Mapp has not shown that the conduct was "physically threatening or humiliating[.]" *Fernandez*, 961 F.3d at 1153 (quoting *Mendoza*, 195 F.3d at 1246). This factor favors Defendants.

### iv.     Interference with Job Performance

Regarding the fourth and final factor of the objective hostile work environment analysis, Mapp testified that the harassment caused him stress, wore him down, and some days made him an "emotional wreck." Mapp Dep. at 180:23-25, ECF No. [28-1]. Apart from those conclusory statements, Mapp has provided no evidence that his work was affected by the comments or conduct. *See, e.g.*, *Mendoza*, 195 F.3d at 1249 (finding that "nothing in the record indicates that [a supervisor's] conduct impaired [the plaintiff]'s job performance"). All evidence indicates that, prior to Mapp's finger injury, Mapp was a model worker who worked more overtime hours than most employees at Merrick. Mapp's own testimony was that he told Anger he had no problem working at the DTC Project site under the supervision of Valladares and Morrison, SMF ¶¶ 51-52; CSMF ¶¶ 51-52. The record reflects that even after his transfer, Mapp took opportunities to continue working overtime at that site. SMF ¶ 60; CSMF ¶ 60.

"Considering the totality of the circumstances, guided by the appropriate factors," the Court concludes that Mapp has failed to provide evidence sufficient to raise a material issue of fact as to whether the harassment was sufficiently severe or pervasive to constitute a hostile work environment. *Fernandez*, 961 F.3d at 1155-56. While some of the jokes and comments in this case are indeed offensive, Mapp never mentioned to anyone at Merrick that he was being subjected to verbal harassment that now forms the basis for his hostile work environment claim. For the reasons

described above, three of the four factors – severity, physically threatening or humiliating conduct, and interference with job performance – have not been shown. To the extent Mapp showed "frequent conduct, the frequency of it does not compensate for the absence of the other factors." *Mendoza*, 195 F.3d at 1248. Thus, Mapp has failed to support his hostile work environment claim with a showing of the type of "extreme" conduct that "amount[s] to a change in the terms and conditions of employment[.]" *Faragher*, 524 U.S. at 788.

Accordingly, Defendants' Motion for summary judgment is granted as to Counts **V** and **VI**.

### D. Racial Discrimination

Lastly, Defendants seek summary judgment as to Mapp's claims of discrimination. To establish a prima facie case for racial discrimination, a plaintiff must show: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (citation omitted). "If the plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221 (citation omitted). "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination.'" *Id.* (alterations in the original) (quoting *McDonnel Douglas v. Green*, 411 U.S. 792 (1981)).

First, Defendants argue that Mapp has failed to show an adverse employment action. ECF No. [20] at 17. They argue that Mapp "earned the most overtime pay of any of Merrick's

laborer/carpenter apprentices" and he was never given inferior job assignment compared to other employees. *Id.* at 17-18. In Response, Mapp contests Defendants' pay record evidence as being hearsay, but Mapp does not argue that he was denied overtime pay compared to non-Black workers. Thus, while Mapp alleges in his Complaint that he received less overtime compared to Hispanic employees, Mapp has apparently abandoned that argument at this summary judgment stage. *See Jones v. Bank of Am., N.A.,* 564 F. App'x 432, 434 (11th Cir. 2014) ("[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

Mapp's only argument that he suffered an adverse employment action is that "he was denied the ability to gain field hours as an apprentice carpenter." ECF No. [27] at 19. "A denial of training may rise to the level of an adverse employment action when the training is materially related to the employee's job responsibilities or possibilities for advancement under limited circumstances." *Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 965 (11th Cir. 2017). Here, it is uncontested that Mapp needed to gain carpentry hours to move up the union scale from an apprentice to a more advanced carpenter. CSMF ¶¶ 116-17; RSMF ¶¶ 116-17. The denial of carpentry experience constitutes an adverse employment action.

However, Mapp has not shown the final element of a prima facie case of discrimination – that similarly situated non-Black employees were treated more favorably than he was. *Lewis*, 918 F.3d at 1220-21. To meet his burden, Mapp must present evidence of comparators who are "similarly situated in all material respects." *Id.* at 1229 (quotation marks omitted).

Mapp has not provided names or specific details of any non-Black employee who received more carpentry hours than he did. He merely asserts that unnamed "Hispanic employees" received more carpentry hours despite having less experience than Mapp. ECF No. [27] at 19. Such vague

assertions to unnamed individuals fail to satisfy Mapp's burden to "provide evidence of a comparator employee – one similarly situated in all material respects – who was treated differently." *Lewis v. Sec'y of U.S. Air Force*, No. 20-12463, 2022 WL 2377164, at * 11 (11th Cir. June 30, 2022). "[W]ithout such comparators, [Mapp] cannot make a *prima facie* case of race . . . discrimination." *McNeal v. Int'l Paper*, No. 21-12672, 2022 WL 5434274, at *4 (11th Cir. 2022).

Mapp's failure to assert a specific comparator in his Response arguably constitutes abandonment of his discrimination claim. *See Jones,* 564 F. App'x at 434 ("[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."). Nonetheless, the Court has thoroughly reviewed the record in an effort to find a potential comparator. In his Complaint, Mapp named a single Hispanic male, "Alex," who allegedly received better treatment than Mapp because he was appointed to be the full-time elevator operator. ECF No. [1] ¶ 50. However, Mapp concedes that Alex, unlike Mapp, was a member of the Operators Union and Merrick's agreement with the Operators Union required Merrick to appoint someone from that Union as the full-time elevator operator. SMF ¶ 50; CSMF ¶ 50. Thus, Mapp and Alex cannot be deemed "similarly situated in all material respects[.]" *Lewis*, 2022 WL 2377164 at * 11. Turning to Mapp's deposition testimony, Mapp named two non-Black apprentice carpenters at the DTC Project who Mapp believed received more carpentry experience: Karla, who was Hispanic,[4] and Ashley, who was White. Mapp Dep. at 46-47, ECF No. [28-1]. However, the record contains no other evidence regarding Karla or Ashley, except that they were paid less than Mapp. *Id*. at 59-60. Mapp has not developed sufficient evidence for a factfinder to conclude that those individuals were "similarly situated" to Mapp. *Lewis*, 2022 WL 2377164 at

---

[4] Mapp referred to Karla as "Spanish." Mapp Dep. at 46, ECF No. [28-1]. He used the terms "Spanish" and "Hispanic" interchangeably. *Id*. at 33-34.

Case No. 22-cv-20385-BLOOM/Otazo-Reyes

*11.

In sum, Mapp has failed to "provide evidence of a comparator employee – one similarly situated in all material respects – who was treated differently." *Lewis*, 2022 WL 2377164 at * 11.[5] He has therefore failed to "make a *prima facie* case of race . . . discrimination." *McNeal*, 2022 WL 5434274 at *4.

Defendants' Motion is granted as to Counts **IX** and **X**.

IV.    **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   Defendants' Motion for Summary Judgment, **ECF No. [20]**, is **GRANTED**.

2.   A final judgment shall issue by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 6, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

---

[5] The Eleventh Circuit in *Lewis* recognized that "failure to produce a comparator does not necessarily doom the plaintiff's case," if the plaintiff presents "a convincing mosaic of circumstantial evidence" of the employer's discriminatory intent. 2022 WL 2377164 at * 10. Mapp has not argued that such circumstantial evidence exists in this case nor does the Court find that the record supports such argument.